IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WARDELL L. GILES, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| V. | ) Civ. No. 02-1674-SLR |
| | ) |
| RICK KEARNEY, DEAN J. | ) |
| BLADES, GARY CAMPBELL, | ) |
| AMY WHITTLE, ROBERT J. | ) |
| CASSASE, SGT. CHARLES | ) |
| STEELE, SGT LLOYD, C/O | ) |
| JUSTICE, C/O MILLIGAN, | ) |
| and C/O ACKENBRACK, | ) |
| | ) |
|     Defendants. | ) |

Edward M. McNally, Esq., Liza H. Sherman, Esq. and Raj Srivatsan, Esq. of Morris James LLP, Wilmington, Delaware. Counsel for Plaintiff.

Eileen Kelly, Esq. and Stacey Xarhoulakos, Esq., Deputy Attorneys General, Wilmington, Delaware. Counsel for State Defendants.

**OPINION**

Dated: September 28, 2007
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Wardell L. Giles ("Giles") filed this lawsuit under 42 U.S.C. § 1983 against defendants Warden Richard Kearney, Sergeant Gary Campbell, Sergeant Robert Cassase, Sergeant Charles Steele, Sergeant Keith Lloyd, Corporal Dean Blades, Correctional Officer Michael Milligan, Correctional Officer Rick Justice, and Correctional Officer Michael Ackenbrack, as well as nurse Amy Whittle. (D.I. 2) Plaintiff alleged constitutional violations arising from alleged use of excessive force at the Sussex Correctional Institution ("SCI") in Georgetown, Delaware.[1] (Id.)

On June 28, 2004, the court granted defendant Whittle's motion to dismiss for failure to state a claim. The court granted summary judgment to (1) defendant Kearney; (2) defendants Blades, Campbell, Cassase, Steele, Lloyd, Justice, Milligan, and Ackenbrack in their official capacities; and (3) defendants Cassase, Steele, and Campbell in their individual capacities on the basis of qualified immunity. (D.I. 64; D.I. 65) Summary judgment was denied to defendants Blades, Lloyd, Justice, Milligan and Ackenbrack in their individual capacities.

The matter was referred to the Federal Civil Panel in order to find representation for plaintiff. (D.I. 66, 71) On April 19, 2006, Edward M. McNally, Esquire entered his appearance as counsel for Giles. (D.I. 117)

A bench trial was held on November 29, 2006 and December 8, 2006 on the remaining claims. (D.I. 141, 144) Giles testified on his own behalf, as well as medical

---

[1] At the pretrial conference, the court granted plaintiff leave to amend his complaint to add allegations that defendants were deliberately indifferent to his medical needs. (D.I. 140 at 18)

expert Dr. James Sumner. Testifying on behalf of defendants were Dean Blades, Charles Steele, Amy Whittle Munson, Michael Ackenbrack, Keith Lloyd, Helen Whitley, Rick Justice, Michael Milligan and Arlen Smith.

Post trial briefing is complete. (D.I. 145, 147, 149) The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Pursuant to Fed. R. Civ. P. 52(a), the following are the court's findings of fact and conclusions of law.[2]

## II. FINDINGS OF FACT

1. During the early evening of November 27, 2001, Giles arrived as a new inmate at SCI.[3] (D.I. 141 at 25, 59) Wearing red kufi for religious reasons, Giles entered the receiving and processing section of SCI (the "receiving area").[4] (Id. at 25, 59, 61)

2. The standard procedure for receiving and processing new inmates was: (1)

---

[2]As the finder of fact, credibility determinations are uniquely the province of the court. Government of the Virgin Islands v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974); United States v. Williams, 400 F. Supp.2d 673, 677-678 (D. Del. 2005). The court is not required to find credible all the testimony presented; in reaching its findings, the court has observed the demeanor of the witnesses and any corroborating or impeaching evidence in determining the credibility of each witness' testimony. The sincerity of Giles' testimony is uncontested, however, when compared against the testimony of defense witnesses, their demeanor during testimony and the supporting exhibits presented, the court finds, on whole, Giles' testimony less credible. As a result, the facts developed, largely, from the testimony of defense witnesses. Instances where the court was unable to reconcile conflicting testimony are noted.

[3]Giles, at 5'7", weighed 195 pounds. (Id. at 24-25)

[4]A "kufi" is a "close-fitting brimless cylindrical or round hat" that is "traditionally worn by persons of African descent to show pride in their heritage and Muslim religion." Booth v. King, 2006 WL 287853, *1 (E.D. Pa. Feb. 3, 2006), rev'd in part, 2007 WL 1073606 (3d Cir. Apr. 11, 2007).

2

collect intake and background information; (2) inventory and store personal property; (3) pat down/strip search; and (4) procure fingerprints. (Id. at 60) New commitments were required to shower and were checked by the nursing staff to determine medical needs and placement. (Id. at 67, 106)

3. Correctional Officer Blades[5] met Giles in the receiving area. Also in the receiving area were: Sergeant Charles Steele[6] and Sergeant Bob Cassase.[7] Blades informed Giles of a new SCI policy that permitted inmates to wear only white kufis. (Id. at 62) Blades told Giles to contact the chaplain to obtain a white kufi.

4. Giles refused to believe there was a SCI policy in place prohibiting red kufis. Giles became angry and demanded that Blades show him the policy. (Id. at 63, 91) Giles cursed at and argued with Blades. (Id. at 26, 93) After repeated orders, Giles turned over his kufi to Blades. (Id. at 57, 63, 64; DX2; DX4)

5. Giles was ordered to remove his clothing for a strip search. (Id. at 93)

---

[5]Defendant Dean Blades ("Blades") has been employed at SCI since 1997. On the night Giles arrived at SCI, Blades, weighing approximately 275 pounds, held the rank of corporal and was working in the receiving area and the property room. (Id. at 58, 80) Although Blades has no formal medical training, he, as well as all SCI correctional officers, receive basic first aid training annually. (Id. at 76)

[6]Sergeant Charles Steele has been employed at SCI since 1992. (Id. at 89) On the night Giles arrived at SCI, Steele was responsible for updating information on new commitments. (Id. at 90)

[7]As noted, plaintiff's claims against defendants Steele and Cassase were dismissed in their entirety. (D.I. 64, 65) The claim against defendant Blades in his official capacity was dismissed but he remains a defendant in his individual capacity. (Id.)

3

Although reluctant, Giles complied. (Id. at 62-63, 65) Giles was then ordered to shower. (Id. at 26, 66) Giles initially resisted because he had showered previously that day. (Id. at 67)

6. Once in the shower facility, Giles had difficulty turning on the water. (Id. at 66) Blades entered the shower facility to assist. Giles resisted Blades' assistance and began calling Blades derogatory and crude names. Blades ordered Giles to shower. Giles refused to cooperate. (Id. at 73-74) In response, Blades capstunned[8] Giles. (Id. at 26, 45, 66-67) Giles swung at Blades and struck him in the mouth.[9] (Id. at 67) Although unable to see because capstun was in his eyes, Giles continued to resist and refused to comply with orders. (Id. at 27, 75-76, 98)

7. Additional correctional officers responded to the scene to assist Blades. (Id. at 27) Giles continued to resist orders. (Id. at 75) Correctional officers wrestled Giles to the wet tile floor. (Id. at 68) In order to subdue Giles and to prevent another assault,

---

[8]"Capstun" is a very effective form of pepper spray. (Id. at 81) Capstun is dispersed though an aerosol can. The use of capstun on an inmate is often referred to as "capstunning." Capstun may cause the following: (1) runny nose; (2) temporarily impaired vision; and (3) sunburn. (Id. at 81) In the prison setting, capstun is used to prevent injuries to inmates and correctional staff, as well as to gain control over a potentially dangerous situation. (Id. at 98, 75) SCI policy regarding use of non-deadly force recognizes capstun as a
>highly effective, non-lethal weapon to be used only when necessary in a professional manner. Capstun should be utilized instead of physical handling. This determination should be made by the senior officer or officer in charge at the scene. Capstun use is justifiable to subdue unruly inmates, separate participants in a fight, for self-defense, in defending staff, inmates or other persons. It may also be used to move inmates that fail to comply with lawful orders.

(DX1 at 8-9)

[9]As a result of this conduct, Giles was charged and subsequently pleaded guilty to the lesser included offense of assault in the third degree. (DX11)

4

Blades positioned himself on top of Giles' middle back. (Id. at 29, 67-68) Giles resisted by repeatedly pushing up on Blades. (Id. at 67-68) Giles testified that correctional officers kicked him in his ribs and punched him in the head, even after he stopped resisting. (Id. at 27-29)

8. Giles was eventually secured by Blades, Cassase and Steele. (Id. at 29, 70) No correctional officer saw Blades hit or kick Giles. (Id. at 97) Giles requested medical attention.[10] (Id. at 34)

9. Nurse Amy Whittle Munson ("Whittle") responded to the area.[11] (Id. at 35, 48) Whittle examined Giles and noted his claims of shortness of breath. She also noted that Giles was very verbal, threatening, angry and loud. (Id. at 107-10; DX-12 at D00136-37) She observed signs of the capstunning (mucus and sneezing), but no signs or symptoms of respiratory distress or bleeding. (D.I. 141 at 109-10) Giles told Whittle that his rib was broken and that he heard it snap. (Id. at 110; DX-5) Whittle observed a slightly elevated respiratory rate and a large red area under his left nipple. (D.I. 141 at 109-112; DX12 at D00136-37) Whittle examined the nipple area but could not confirm a break of Giles' ribs. (D.I. 141 at 112) Whittle listened to his lungs and checked his oxygen level with a pulse oximeter. (Id. at 106-107) Whittle concluded

---

[10]SCI has a medical department staffed with nurses on duty 24 hours a day. (D.I. 141 at 76,105) There are at least two nurses in the infirmary at all times. A third nurse is stationed in the receiving area. (Id.) Prison doctors are present during daytime hours. (Id. at 76) The prison infirmary serves as the hospital for inmates. (Id. at 105) Correctional officers do not have access to inmate medical information. (Id. at 77) Decisions regarding inmate health care are made by medical personnel.

[11] Whittle was a registered nurse for approximately one year when she examined Giles. (D.I. 141 at 104) She had seen the effects of capstun exposure and had experience treating individuals so exposed.

5

that Giles did not have subcutaneous emphysema, or the release of air from a punctured lung. (D.I. 141 at 114; DX12 at D00136-37)

10. Whittle called a prison doctor to discuss Giles' condition. (Id. at 113-115) Whittle called the doctor because her assessment did not comport with Giles' complaints. She wanted to give the doctor a chance to decide if Giles should be taken to the emergency room. The doctor ordered X-rays to be taken the following day and that his condition continued to be monitored. After his examination, plaintiff was transferred to a cell in the infirmary. (Id. at 116-17)

15. Around 2:00 a.m., Giles started banging on his cell door and demanding medication.[12] (Id. at 36, 39, 161, 174-75) Giles was yelling, cursing and beating on the cell door so hard that it rattled. (Id. at 128-129, 161-162) Correctional officers in the infirmary area ordered Giles to stop yelling and beating on the door. (Id. at 37, 131, 162) He refused to comply. There is no evidence that the nursing staff advised correctional officers of the reason for Giles' stay in the infirmary or whether he was receiving treatment. (Id. at 156-157)

16. Correctional Officer Michael Ackenbrack ('Ackenbrack") responded to Giles' cell. (Id. at 125) Ackenbrack told Giles that he would check with the nursing staff about his request for medication. (Id. at 125) Ackenbrack conferred with an infirmary nurse and learned there was no medication order for Giles. (Id. at 130) Ackenbrack told

---

[12]Plaintiff testified that he demanded "medical attention," and told defendant Ackenbrack that he "needed to see a doctor," "was in pain," "couldn't breathe," and that it was a "serious situation." (D.I. 141 at 36-37) Aside from plaintiff's testimony, there is no evidence that plaintiff demanded anything other than medication. (Id. at 36, 129-30, 174-75)

6

Giles this information. Giles became enraged. He punched the cell door, yelled, cursed and refused to calm down. (Id. at 128-131, 162-163) Additional efforts by Ackenbrack to calm Giles down failed. (Id. at 162-163)

17. In order to control the situation, Ackenbrack entered his cell and sprayed capstun at Giles from about two to four feet away. (Id. at 37, 131-32, 148, 164; DX7, DX6) No additional force was used on Giles.[13] (Id. at 38-39) Nurse Whitley examined Giles after he was capstunned. (Id. at 155) Whitley noted in medical records that Giles was breathing normally. Whitley performed a test to measure the oxygen level in the blood, which revealed normal results. (Id. at 156)

18. Later that morning, on November 28, 2001, Giles was x-rayed. The x-rays revealed a broken rib and punctured lung. (DX12) Giles was transferred by ambulance to a local hospital, where he received surgery and treatment for contusions, a broken rib and a punctured lung. (Id. at 41-42; DX12 at D00101-103,106) Giles was returned to SCI on December 2, 2001. (Id. at D00132)

19. Dr. James Summer, an emergency room physician who reviewed the medical records but did not perform a physical examination on Giles, opined that the injuries suffered were serious. (D.I. 144 at 10-14, 20) Specifically, when a rib is broken and lung punctured, the lung collapses and outside air pressure increases in the chest cavity outside of the collapsed lung. (Id. at 12-13) Such pressure can cause internal organs to move, cutting off blood flow to the heart and increasing risk of death. (Id. at 19-20) Dr. Sumner concluded that Giles was subjected to the risk of a life

---

[13]Although Giles testified that he was beaten after the capstunning, he provided no specific details nor proof to substantiate this allegation.

7

threatening injury for over 24 hours due to the delay in diagnosis and transfer to the hospital. (Id. at 20) Giles received treatment in time to preclude more serious conditions. Dr. Sumner acknowledged that the treatment provided would have been the same regardless of whether Giles had been transported to the hospital immediately after the incident or, as was the case, the following day. (Id. at 24)

20. Giles continues to suffer from problems as a result of the events in issue. (D.I. 141 at 42-43, 52) Specifically, he suffers from depression and lacks the endurance he once had to perform sports and activities.

### III. CONCLUSIONS OF LAW

1. Plaintiff asserts that excessive force was used against him in the shower room when he talked back to correctional officers. (D.I. 145) He claims that excessive force was used against him in the SCI infirmary when he was capstunned for complaining about his medical condition. He claims that he was denied medical care while in the SCI infirmary.

2. Defendants contend that the use of the capstun on each occasion did not constitute excessive force. (D.I. 147) They assert their actions were a reasonable response to plaintiff's threatening and aggressive behavior. They further counter that they were not deliberately indifferent to plaintiff's medical needs.

3. Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). This includes measures taken by prison officials to prevent a disturbance or threat to institutional security. Whitley v. Albers, 475 U.S. 312, 322

8

(1986).

    4. The central question in an excessive force claim is whether force was applied in a "good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 322; Hudson v. McMillian, 503 U.S. 1, 7 (1992). Use of force is actionable under § 1983 when it exceeds "that which is reasonable and necessary under the circumstances." Davidson v. O'Lone, 752 F.2d 817, 827 (3d Cir. 1984). The court must determine whether the force was applied in good faith by weighing the following factors: (1) the need for application of the force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the threat to the safety of staff and inmates reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. Whitley, 475 U.S. at 321; Brown v. Terry, 469 F. Supp. 2d 256, 260 (D. Del. 2007); Thomas v. Ferguson, 361 F. Supp. 2d 435, 438 (D. N.J. 2004).

    5. "The use of mace, tear gas or other chemical agent of like nature when reasonably necessary to subdue recalcitrant prisoners does not constitute cruel and inhumane punishment" even if the inmate is handcuffed or locked in the cell. Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir.1984).

    6. Considering the five Whitley factors against the findings of fact, the court concludes that the force used, on each occasion in dispute, was not maliciously and sadistically applied to cause harm. With respect to the first capstun incident, the use of force was justified in response to Giles defiant and argumentative behavior, as well as his repeated refusals to obey orders. By spraying capstun instead of using physical handling, Blades applied proportionate force to quell Giles' behavior.

9

7. Significantly, as one of the first correctional officers to encounter Giles at SCI, Blades witnessed Giles grow increasingly agitated, non-compliant and unpredictable. Alone in the shower facility as Giles continued to yell and defy orders, the use of capstun to calm an increasingly volatile situation and prevent injury was a measured and reasonable response.

8. Similarly, the force used after Giles struck Blades was not excessive considering the evolving series of events. Since the capstun did not work (Giles continued to resist), physical handling was necessary. After Giles struck Blades, correctional officers responded and attempted to subdue Giles. By sitting on top of Giles' back, Blades was trying to control Giles as well as the unfolding situation. The force used by Blades was not maliciously or sadistically applied to cause pain.

9. With respect to the second capstun incident, the capstun was used after Giles repeatedly refused to obey orders to stop yelling and banging on his cell door at 2:00 a.m. The application of one spray of capstun was proportionate and reasonable under the circumstances, especially considering Giles' disturbing conduct at 2 a.m. Moreover, there is no evidence that Giles suffered any serious injuries from this capstun incident. Furthermore, to the extent Giles argues that the application of capstun was in violation of SCI policies and procedures, failure to comply with any internal prison regulations does not constitute a constitutional violation. Sandlin v. Conner, 515 U.S. 472 (1995).

10. The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 103-105, (1976). In order to set forth a cognizable claim, an

inmate must allege (I) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. Estelle v. Gamble, 429 U.S. at 104, Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.1999); White Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." Estelle, 429 U.S. at 104.

11. The record reflects that Giles received medical care and assessment following each of the events in issue. There is no evidence that defendants obstructed, neglected or prevented Giles from receiving care or ignored his requests for medication or medical treatment. While in the infirmary, Ackenbrack followed up on Giles' demand for medication by checking with a nurse. Ackenbrack had no role or responsibility in the prison doctor's decision to not order medication for Giles. Following a reassessment of Giles injuries later that morning, he was transferred to a hospital for treatment and evaluation.

## IV. CONCLUSION

For the reasons stated, plaintiff has not demonstrated by a preponderance of the evidence that defendants violated his rights under 42 U.S.C. § 1983. An appropriate order shall issue.